**SO ORDERED.**

**SIGNED this 1st day of September, 2020.**



*Dale L. Somers*

Dale L. Somers
United States Chief Bankruptcy Judge

## DESIGNATED FOR ONLINE PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:

Jeffrey Theron Goodvin,

                  Debtor.

             Case No. 19-10623
             Chapter 7

Jeffrey Theron Goodvin,

                  Plaintiff,

v.

United States Department of
Education, Nelnet Inc., American
Education Services a/k/a
Pennsylvania Higher Education
Assistance Agency, and
Educational Credit Management
Corporation,

                  Defendants.

             Adv. No. 19-5105

1

# Memorandum Opinion Granting, in Part, Complaint to Discharge Student Loan Debt

This student loan case fits the definition of insanity.[1] After consolidating his then-outstanding student loans in 1992 and later taking out six more student loans for further education between 2009-2013 in the combined principal amount of approximately $39,000, and making payments in excess of $28,000 on those loans, 56-year old Debtor-Plaintiff Jeffrey Goodvin finds himself in year 2020, seven years removed from his last educational stop, owing over $77,000. His payments of $19,527 on the $12,077 consolidation loan did not even pay the monthly accrual of interest, leaving Goodvin owing nearly $50,000. Little will change if Goodvin consolidates all these loans and enrolls in the income-driven REPAYE plan for twenty years—at which time Goodvin will have been retired for about ten years and be seventy-six years old. The REPAYE plan is the most "favorable" income-driven repayment plan available to Goodvin and the plan advocated by defendants for him to repay and discharge (by forgiveness) his student loan debt. Under the *Brunner* test,[2] requiring Goodvin to continue paying on his 1992 consolidation loan imposes an undue hardship on him and denies

---

[1] "Insanity: doing the same thing over and over again and expecting different results." Unknown. This quote is often misattributed to Albert Einstein. *See* https://quoteinvestigator.com/category/albert-einstein/page/2/, last viewed July 23, 2020, citing *The Ultimate Quotable Einstein,* Edited by Alice Calaprice, Section: Misattributed to Einstein, Quote Page 474 (Princeton University Press 2010).
[2] *Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395 (2d Cir. 1987).

him a fresh start. A partial discharge of Goodvin's student loan debt is granted under § 523(a)(8).[3]

## I. Findings of Fact[4]

Goodvin filed this Chapter 7 bankruptcy on April 17, 2019. He is age 56, single, and has no dependents. He is healthy and suffers from no medical conditions that preclude or impact his ability to work. Goodvin will be eligible to retire at full retirement age in about ten years. At the time of filing, Goodvin had been employed one year as a plumber/pipefitter apprentice with Waldinger Corporation, and was enrolled in the five-year local union apprentice program. He was laid off in late January 2020, but was re-hired in June by Waldinger and remained employed on the date of trial. When he was laid off, Goodvin continued with the apprentice coursework, but switched to

---

[3] Trial was held in this matter on July 15, 2020. Goodvin appeared in person and by his attorney January Bailey. Attorney N. Larry Bork appeared on behalf of defendant Educational Credit Management Corporation (ECMC). Assistant U.S. Attorney Brian D. Sheern appeared on behalf of defendant U.S. Department of Education (DOE).

[4] The Court's recitation of the facts is based upon Goodvin's trial testimony, the trial exhibits (including Goodvin's deposition testimony given on March 31, 2020 (Trial Ex. 11), and interrogatory answers attached as deposition exhibit), and extensive stipulations of fact by the parties regarding the student loans incurred, payments made by Goodvin, and Income-Driven Repayment (IDR) plan options for which Goodvin's loans would qualify. *See* Adv. Doc. 57 (Stipulations of fact regarding the ECMC loans) and Adv. Doc. 58-1 [also DOE Trial Ex. A] (Stipulations of fact regarding the DOE loans based on the declaration of Cristin Bulman, a Loan Analyst for the DOE in the Office of Federal Student Aid).

3

the HVAC apprentice program to enhance his employment prospects and move up the union list of apprentices.

According to his schedules, Goodvin owns a modest home valued at about $50,000 and a 2014 Chevrolet Cruz valued at $7,900. Both are secured to Meritrust Credit Union; it holds an outstanding $42,000 mortgage on the home and has a $9,500 claim for the car loan. He pays $188 per month (for 56 months) for the car and $507 per month (for 163 months) for the home. The home and car are his only secured debts. Goodvin reaffirmed both of these debts. Goodvin scheduled general unsecured debt of about $93,000, of which some $73,000 is student loan debt, and the remaining balance is nearly all credit card debt. At the time of trial, the student loan debt exceeded $77,000 due to the accrual of interest.

## A.    Goodvin's Education and Work History[5]

Goodvin first attended Wichita State University (WSU) for four years (1982-1986), but earned no degree. None of the student loans at issue pertain to his time at WSU. He worked the following year, before returning to school full-time at the Brooks Institute of Photography (Brooks) in Santa Barbara, California from the spring of 1987 to the spring of 1990. He obtained a Bachelor of Arts degree in Fine Arts, majoring in photography, film making

---

[5] *See* Ex. 11, Answer to Interrogatory No. 13 at Goodvin 15-18.

4

and videography. After obtaining his degree, Goodvin worked for various film production companies and freelanced in the film industry in California and Chicago. When the film freelance work slowed in the mid-1990s, he freelanced as a camera technician for Panavision until the late-1990s. From there, Goodvin moved back to Wichita and worked for various television stations in news production and as a camera news photographer. He left Wichita in 2004, accepting an offer in Santa Barbara with a news station as a news photographer where he worked for the next three years.

When he became unemployed in 2007, Goodvin determined that he needed to improve his skills in digital media technology to attain better employment. In the fall of 2007, he enrolled at Santa Barbara City College (SBCC). He attended SBCC until the spring of 2013, majoring in Media Arts.[6] He received a certificate in Multimedia Studies in the spring of 2013, but was one 3-hour course shy of earning an associate's degree. While in school, Goodvin worked in the media department for the City of Santa Barbara. Upon leaving SBCC in 2013, he took a full-time job as a news producer with the same station he had worked for in 2004. When his contract ended in the spring of 2016, he left Santa Barbara and moved to Tulsa, Oklahoma, working briefly for a local news station as a producer.

---

[6] Goodvin briefly withdrew from classes in the spring of 2010, but re-enrolled a couple of months later.

Goodvin returned to Wichita in the fall of 2016 where he worked at a news station until he was laid off in February of 2018. While on unemployment Goodvin attended a job fair where he learned of the Plumbers and Pipefitters Local Union 441 and was offered an opportunity to join its apprentice program. By this time, Goodvin decided it was time for a career change with better pay and more stable employment; he started the apprenticeship in May of 2018 and began working for Waldinger. In sum, Goodvin's employment history from 1990 to the present has been marked by several relocations, intermittent job loss, layoffs, and periods of unemployment, through no apparent fault of his own.

## B.    Goodvin's Student Loans and Repayments[7]

All of Goodvin's student loans are for undergraduate studies at Brooks and SBCC and were made under the Federal Family Education Loan Program (FFELP) or the Ford Direct Loan Program (FDLP or Direct), both programs being authorized under Title IV of the Higher Education Act (HEA) of 1965, as amended.

### 1.    ECMC Loans[8]

---

[7] *See* Ex. 12, DOE Ex. A, ECMC Ex. A, and Doc. 57.

[8] *See* Doc. 57. Goodvin initially named the DOE, Nelnet, and American Education Services (AES) as party defendants. ECMC moved to be added as a party defendant because it guaranteed and held a consolidated loan and a Stafford loan; that motion was granted by agreement. Doc. 30. Pennsylvania Higher Education Assistance Agency (PHEAA), also known as AES, filed an answer out of time. AES was the servicer of the Stafford loan. Pursuant to a stipulated dismissal, PHEAA (AES) was voluntarily dismissed as a party to this proceeding. Doc. 49. Nelnet serviced the

ECMC guaranteed and currently holds two student loans in the principal amount of $15,577—a FFELP Consolidation loan disbursed in 1992 in the amount of $12,077 and a FFELP Stafford loan disbursed in 2009 in the amount of $3,500. The Consolidation loan accrues interest at the rate of 9%; it combined three student loans Goodvin took out while attending Brooks (1987-1990). Goodvin incurred the Stafford loan while studying at SBCC. It accrues interest at the rate of 6%.

Goodvin has made payments totaling $21,817 on the ECMC loans—$19,527 on the Consolidation loan and $2,290 on the Stafford loan. Goodvin now owes approximately $49,581 on the Consolidation loan and $2,147 on the Stafford loan. Goodvin's last loan payments were made under a Standard repayment plan: $302.01 on the Consolidated loan and $50 on the Stafford loan. The Consolidated loan accrues monthly interest of $372 and the Stafford loan accrues about $11 interest per month.[9]

## 2. **DOE Loans**[10]

While attending SBCC, Goodvin incurred student loan debt in the principal amount of $23,500, consisting of five student loans disbursed

consolidated loan held by ECMC but never filed an answer. The Court concludes that ECMC and DOE are the proper parties before it.
[9] Goodvin briefly defaulted on the Consolidation loan in 2005, but the loan was "rehabilitated" in 2007. Doc. 57 at ¶4.
[10] DOE Ex. A.

between 2009 and 2012: a FFELP Stafford loan in the amount of $4,500 and four Direct Stafford loans in the amounts of $4,500, $4,000, $4,500, and $6,000. The interest rates on those loans range from 3.4% to 6.8%.

Goodvin has made payments totaling at least $6,256[11] on the DOE loans. As of October 4, 2019, the balance owed on the student loans is $25,541. The repayment period on the DOE loans began in November 2013, six months after completing his studies at SBCC; his first payments began in March 2014. He initially entered the Graduated repayment plan and made monthly payments for nearly two and one-half years totaling $5,244 on the DOE loans.[12] In late 2016, he applied for an income driven repayment (IDR) plan and was enrolled in the Income Based Repayment (IBR) plan, making payments between 2017-2019 totaling $1,032, until holds were placed on his student loans in April 2019 due to his bankruptcy filing.[13] Most of the DOE

---

[11] The Court's addition of the Graduated and IBR repayments total $6,276, not $6,256. In addition to those repayment plans he made a single payment of $171.59 during his brief withdrawal from SBCC. With the inclusion of that payment, Goodvin has paid some $6,448 on the DOE loans. *See* DOE Ex. A, ¶s 24, 26, 28.

[12] Goodvin's monthly payments under the Graduated plan started at $166, and by the start of the third year those monthly payments had increased to nearly $217 under the repayment schedule. The last 21 payments under the Graduated plan were scheduled to be $475.98. *See* DOE Ex. A, ¶¶ 25-26.

[13] Under the IBR 25-year plan, a borrower's monthly payments are capped at 15% of "discretionary" income (the amount by which Adjusted Gross Income [AGI] exceeds 150% of the HHS Poverty Guideline amount for a family of one). This describes the "old IBR plan." *See* John Patrick Hunt, *Help or Hardship?: Income-Driven Repayment in Student-Loan Bankruptcies,* 106 GEO. L. J. 1287, 1312 n. 179 and n. 181 (2018) (hereafter "*Help or Hardship?").* Goodvin's monthly payment started at $46.83, based on his AGI of $32,010 and family size of one; after his bankruptcy

student loans accrue monthly interest in the $12-$30 range, the exception being the 2010 $4,000 loan at 6.8%—it accrues interest at $42 per month, which results in a current balance of $7,493 after application of Goodvin's payments on this loan in the amount of $1,268.

C.      *The Union Apprentice Program*

As part of his career shift to becoming a plumber and pipefitter in the spring of 2018, Goodvin applied for and was accepted into the union's five-year apprentice program and was hired by Waldinger Corporation as a first-year apprentice working in Topeka. Because he was working more than sixty miles from Waldinger's Wichita division office he received a per diem (or subsistence) for expenses, in addition to his hourly wage for an Apprentice 1 under the local union pay schedule. As part of the apprentice program, Goodvin is required to complete seven, one-week courses each year and meet certain work hour requirements. His tuition for the classes is $600 each year. Goodvin receives unemployment during each of the seven weeks he is attending classes and is not paid by Waldinger. Upon successfully completing the five-year apprentice program, Goodvin will be elevated to a certified journeyman.

---

discharge was entered, Goodvin recertified his income in September of 2019 which reduced his monthly payment to $44.55. The DOE reinstated the hold on Goodvin's account when he filed this adversary proceeding to discharge his student loans. *See* DOE Ex. A, ¶¶ 27-31.

He started his first course in the program in the fall of 2018 and completed his first-year apprenticeship while working for Waldinger. He started his second year as apprentice in 2019 but in late January 2020 Waldinger laid off Goodvin; he was able to continue taking the coursework for the apprentice program. While laid off he shifted his focus to HVAC (Heating, Ventilation and Air Conditioning), believing it would yield better and more secure employment. Waldinger re-hired him in June of 2020, this time to work in Wichita. At the time of trial, Goodvin was a second-year apprentice in HVAC, anticipating advancement to third-year apprentice, and employed by Waldinger.

Goodvin is paid weekly. As a second-year apprentice, he is currently paid $20.86 per hour for a forty-hour week per the union pay scale and his most recent June paystub (for the week ending June 16) shows weekly gross earnings of $834.40.[14] He nets $615.16 a week after taxes and other payroll deductions. He works in Wichita and is no longer paid a per diem.[15] During his four-month layoff from Waldinger in 2020 (February-May) Goodvin drew weekly unemployment of $366, plus an extra $600 in increased

---

[14] Ex. 7, p. 269 and Ex. 6, p. 208.
[15] Ex. 6, p. 208. The per diem or "subsistence" would show up on the paystub as "Other Earnings & Reimbursements." None is reported for the current week ending June 16, but he had been paid $720 year-to-date while working in Topeka prior to his layoff.

**10**

unemployment benefits as part of the first COVID-19 stimulus relief package (*i.e.* The CARES Act).[16] He was also paid unemployment of $428 for each week he was attending apprentice classes in 2020. Goodvin testified that he continued to take apprentice classes after he was laid off. The annual forty-five-work weeks and seven-classroom weeks (with attendant unemployment compensation) will continue until Goodvin completes his apprenticeship program in 2023.

### D. *Goodvin's Current Income and Expenses*

Extrapolating the above pay figures, and assuming Goodvin remains continuously employed, his current monthly income is about $2,556,[17] per the calculation below.

> $27,675 = Regular net weekly Waldinger income of $615 x 45 weeks
> $2,996 = Unemployment for apprentice coursework $428 x 7 weeks[18]
> $30,671 = Annual Net Income
> $2,556 = Monthly Net Income ($30,671 ÷ 12)

---

[16] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020).

[17] The Court recognizes that Goodvin will have less current monthly income in 2020 because he will not have worked the full 45 weeks. He was unemployed approximately sixteen weeks (February through May). So, in tax year 2020 Goodvin would have his regular wages income for twenty-nine weeks, regular unemployment benefits for sixteen weeks, and unemployment compensation for apprentice coursework for seven weeks.

[18] Goodvin testified at trial that he believed no taxes were withheld from these unemployment benefits. If so, his monthly net income would be less.

11

The Court observes that Goodvin has received very small income tax refunds, suggesting that he hasn't over withheld income taxes that would necessitate an adjustment on his Form W-4.[19]

Goodvin's current monthly expenses are not as straightforward, as three varying monthly expense schedules between April 2019 and December 2019 were admitted into evidence in which monthly expenses ranged from a low of $2,195 to a high of $2,734. ECMC introduced a demonstrative exhibit of a side-by-side comparison of the monthly expenses per Schedule J on the date of filing,[20] amended Schedule J filed September 27, 2019,[21] and Goodvin's answer to Interrogatory No. 18.[22] Unlike the typical student loan case before this Court, Goodvin's monthly expenses were not hotly contested by defendants and they are reasonable. Some differences can be explained by expenses being placed in combined categories as provided for on Schedule J (*e.g.* line 6a: Electricity, heat, natural gas) and those broken down into separate categories as provided on Interrogatory No. 18 (*e.g.* Electricity/Gas

---

[19] Ex. 8 (2017 tax refund of $402); Ex. 9 (2018 tax refund of $74); Ex. 10 (2019 tax refund of $74). Courts generally consider tax refunds as part of debtor's monthly income. *See Piccinino v. U.S. Dept. of Educ. (In re Piccinino),* 577 B.R. 560, 564 (8th Cir. BAP 2017); *Gesualdi v. Educ. Credit Mgmt. Corp. (In re Gesualdi),* 505 B.R. 330, 341 (Bankr. S.D. Fla. 2013).
[20] ECMC Ex. F.
[21] Ex. 11, pp. 374-75.
[22] Ex. 11, p. 347 (Goodvin 00023)

12

and Heat).[23] The Court has compared those category numbers and finds that the difference between Amended Schedule J and answers to Interrogatory No.18 are de minimis.

For ease of reference and familiarity, the Court will work off Goodvin's Amended Schedule J filed September 27, 2019.[24] At trial, Goodvin updated his mortgage payment to $528, rather than $507. The increased payment was not disputed. Goodvin claims $120 for electricity/heat/natural gas on line 6a of amended Schedule J; those categories total $78 in his interrogatory answer. The Court allows $120 as a reasonable expense. For the category of telephone/internet/cable on line 6c, Goodvin lists $163 on amended Schedule J. Those separate categories in the interrogatory answer total $158, allowing for an increased cable/internet cost of $76 as Goodvin testified, Netflix $9, and telephone $73. The Court will allow $163 as shown on Schedule J. Water, sewer, and trash on line 6b is $56. Those components total $60 on the interrogatory answer. The Court will allow $60. Goodvin listed his monthly food and housekeeping supplies expense at $400 on Schedule J. In the interrogatory answer, food was broken down into separate categories,

---

[23] *See also,* Schedule J, line 6b (Water, sewer, garbage collection) versus Interrogatory No. 18 (Water/Sewer and Trash); Schedule J, line 6c (Telephone, cell phone, internet, satellite, and cable services) versus Interrogatory No. 18 (Telephone and Cable/Internet and Netflix).
[24] Amended Schedule J was filed as an attachment to the complaint in the adversary proceeding. *See* Doc. 1, pp. 17-19.

**13**

groceries/household items and meals outside household (*i.e.* eating out); that totaled $550. The Court finds $550 to be a reasonable monthly expense for food and household items. The $50 monthly expense for Goodvin's apprenticeship classes should be allowed as he testified in his deposition that the costs of those classes were $600 annually.[25]  Monthly expenses of $22 for Goodvin's elderly mother should be disallowed because he testified in his deposition that his assistance to her consists of running errands, checking on her welfare and the like, not financial assistance.[26] To summarize, the following monthly expenses and amounts are reasonable:

| | |
|---|---:|
| Home mortgage[27] | 528 |
| Home maintenance, etc. | 100 |
| Electricity, heat, natural gas | 120 |
| Water, sewer, trash | 60 |
| Telephone, cable, internet, etc. | 163 |
| Food and household supplies | 550 |
| Clothing, laundry, dry cleaning | 75 |
| Personal care products/services | 125 |
| Medical/dental expenses | 40 |
| Transportation, etc. | 150 |
| Entertainment, recreation, etc. | 75 |
| Car Insurance | 108 |
| Car Tags[28] | 15 |
| Car loan payment | 188 |
| Apprenticeship classes | 50 |
| Total monthly expenses | $2,347 |

[25] Ex. 11, p. 48.

[26] Ex. 11, pp. 9-10

[27] Because Goodvin has not separately listed property insurance or real estate taxes on his home on lines 4a or 4b of Schedule J, the Court assumes those expenses are included in the mortgage payment.

[28] Per line 16 of Schedule J for taxes, the Court assumes the "car tags" entry includes annual personal property taxes on the car and registration of the vehicle.

14

Deducting the monthly expenses from his current net monthly income as previously calculated ($2,556), Goodvin's disposable income is **$209**. His last monthly payments on all student loans was a combined $398.84. Monthly interest on the combined loans accrues in the amount of $502.[29]

Goodvin was paying $46.83 a month on the DOE loans under an IBR repayment plan until this bankruptcy was filed. The five DOE loans collectively accrue monthly interest of $120.23.[30] On the two ECMC loans, Goodvin's most recent payment amounts under a Standard repayment plan were $302.01 on the Consolidation loan and $50 on the Stafford loan. The ECMC loans accrue monthly interest of $372 and $11, respectively.[31]

In addition to his current monthly income and expenses, Goodvin reported Adjusted Gross Income (AGI) of $42,735 on his 2017 tax return,[32] $30,104 on his 2018 tax return,[33] and $38,022 on his 2019 tax return, his first full year employed as an apprentice by Waldinger.[34]

---

[29] Ex. 12, p. 454.
[30] *Id.*
[31] *Id.*
[32] Ex. 8. $11,900 of AGI consists of Goodvin's liquidation of a retirement account for a down payment on his house, which subjected him to an additional 10% tax on the withdrawal. He was employed by news stations in 2017.
[33] Ex. 9. Of his 2018 AGI, approximately $6,000 was attributed to unemployment compensation. This was Goodvin's first year working for Waldinger (about seven months) and in the apprentice program.
[34] Ex. 10. The 2019 AGI included another $2,318 IRA distribution (for his bankruptcy attorney's fees), and $2,194 unemployment compensation.

15

## II. Conclusions of Law

An adversary proceeding concerning "the dischargeability of particular debts" is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction.[35]

What is strikingly absent in this student loan case is any vigorous contest that Goodwin has failed to maximize his income or minimize his expenses in arriving at his minimal standard of living.[36] The DOE and ECMC contend that Goodwin does not meet the *Brunner* test for a complete discharge of his student loan debt that is now in excess of $77,000. They suggest the solution for Goodwin is to consolidate all of the loans and enter into the income-driven REPAYE (Revised Pay as You Earn) plan, committing to pay $157 a month (or whatever his annual certified AGI requires) for the next twenty years, and at the end of the repayment term obtain "forgiveness" of the balance. The REPAYE plan is similar to the IBR plan. It caps a

---

[35] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

[36] *See Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland),* 424 B.R. 883, 890 (Bankr. D. Kan. 2010) (noting that a court must "determine if the debtor has made a good faith effort to repay the loan as measured by his or her efforts to obtain employment, maximize income and minimize expenses" (internal quotation and alteration marks omitted)).

16

borrower's monthly payment at 10%, rather than 15%, of discretionary income—the amount by which Goodvin's AGI exceeds 150% of the federal poverty guidelines for a family of one.[37] However, in closing argument, defendants did not contend that Goodvin could repay the student loans. To argue otherwise would strain credibility.

## A. Discharging Student Loan Debt Under § 523(a)(8)

Section 523(a)(8) excepts qualified educational loans from discharge "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."[38] More than thirty years ago, the courts developed a judicial test—based on the three-prong *Brunner* test[39]—to determine whether a debtor's circumstances are such that repaying an educational loan constitutes an undue hardship. In *Polleys,* the Tenth Circuit Court of Appeals adopted the *Brunner* test, describing what the debtor must show to establish undue hardship:

> (1) that the debtor cannot maintain, based on current income and expenses a "minimal" standard of living for [himself] and [his] dependents if forced to *repay* the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to *repay* the loans.[40]

---

[37] *See* note 13, *supra.*
[38] 11 U.S.C. § 523(a)(8).
[39] *Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395 (2d Cir. 1987).
[40] *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1307 (10th Cir. 2004) (emphasis added).

17

*Polleys* further instructs that discharging student debt should be based upon an inability to earn and not simply a reduced standard of living.[41] This Court isn't strictly confined to the *Brunner* test, but may consider other facts and circumstances. The *Polleys* court cautioned: "[T]o better advance the Bankruptcy Code's 'fresh start' policy, and to provide judges with the discretion to weigh *all the relevant considerations*, the terms of the test must be applied such that debtors who truly cannot afford to *repay* their loans may have their loans discharged.[42] In other words, bankruptcy's fresh start policy is a relevant consideration in the student loan undue hardship analysis.[43]

### 1.    Minimal Standard of Living

Based on his current budget, Goodvin has $209 of disposable income each month that he could apply toward his student loan debt. This is insufficient to *repay* his student loans. Defendants contend that Goodvin is eligible for consolidation of all his loans and can afford to pay $157 monthly— the current monthly payment calculated under the 20-year REPAYE plan. That is all true as far as it goes. This is less than half of what he was trying to pay collectively on his student loans through various repayment options. His difficulty in making nearly $400 monthly student loan payments likely

---

[41] *Id.* at 1306.
[42] *Id.* at 1309 (emphasis added).
[43] *See Help or Hardship?,* 106 GEO. L. J. 1287, 1295, 1299, 1318-23.

18

explains why he has accumulated $20,000 in credit card debt. He liquidated a retirement account for a down payment to buy a very modest home to live in.[44] He withdrew most of the funds from another retirement account to pay his bankruptcy attorney. In short, Goodvin has lived a lifestyle far-removed from excess; in theory his current monthly budget allows a $50 "cushion," but he is unable to save for retirement in any significant way or *repay* his student loan debt.

The availability of an IDR plan is a factor that is usually considered under *Brunner's* good faith prong,[45] but the Court also mentions it here, to the extent that participation in an IDR plan makes a minimal payment affordable to a student loan debtor.[46] To be clear, the REPAYE plan is not the panacea that defendants make it. Goodvin's loans can be consolidated into a Federal Direct Consolidation Loan that is eligible for the various IDR options, including the REPAYE plan.[47] By consolidating all the loans into a

---

[44] Goodvin has an IRA of some $12,000 remaining from his employment with the City of Santa Barbara.

[45] *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete),* 412 F.3d 1200, 1206 (10th Cir. 2005) (participating in a repayment program is not required to satisfy the good faith prong but "is considered an important indicator of good faith"). *See also Help or Hardship?,* 106 GEO. L. J. 1287, 1326-28.

[46] *See Murray v. Educ. Credit Mgmt. Corp. (In re Murray),* 563 B.R. 52, 60 (Bankr. D. Kan 2016) (rejecting availability of IDR plan as a basis for finding debtors' net income to be sufficient to repay the loans while maintaining a minimal standard of living), *aff'd sub nom. Educ Credit Mgmt. Corp v. Murray,* No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).

[47] DOE Ex. A, ¶¶ 35-36.

Federal Direct Consolidation Loan, Goodvin will be subjected to a higher interest rate than the interest rates on most of the individual loans. The applicable interest rate on the Direct Consolidation Loan will be a weighted average of the interest rates on the unpaid principal balance of the loans being consolidated, rounded up to the nearest one-eighth of one percent.[48] By the Court's calculation using an online weighted average interest rate calculator,[49] the annual weighted average interest rate on the unpaid principal amounts of Goodvin's loans is at least 6.67%,[50] and rounded up to the nearest 1/8th of 1 percent[51] equals 6.750%. Thus, the monthly accrual of interest at this rate on a $77,270 Direct Consolidation Loan is over $400.

In short, the REPAYE plan acronym is a misnomer. In this case, it won't even "repay" the interest accruing each month on the student loan debt. In the loan or finance context, repayment means paying the amount borrowed and the interest. And because the REPAYE plan does not apportion payments between principal and interest, but applies payments first to

---

[48] *See* 20 U.S.C. § 1087e(b)(8)(D).
[49] *See* https://studentloanhero.com/calculators/weighted-average-interest-rate-calculator.
[50] The Court used the following loan amounts and corresponding interest rates on each of the seven loans from Exhibit 12, p. 453 as follows: ECMC $12,078 (9%); ECMC $2,148 (6%); DOE $4,239 (5.6%); DOE $4,199 (4.5%); DOE $4,000 (6.8%); DOE $4,315 (3.4%); and DOE $5,295 (6.8%). If accrued interest was capitalized and included as part of the unpaid principal balance of each loan, the current balances of the loans and corresponding interest rates would yield an even higher weighted average interest rate when rounded up to the nearest one-eighth of one percent.
[51] One-eighth increments of 1% are .125, .250, .375, .500, .625, .750, .875, and 1.

accrued interest, when the payment amount is less than the interest accrual, the REPAYE plan "repays" neither.

Goodvin's projected $157 payment under the REPAYE plan will not cover the monthly accrual of interest and will not make a dent in paying down the principal amount of the student loan debt. Currently, interest of $503 accrues on the total student loan debt each month.[52] If the weighted average interest rate of 6.750% on a Direct Consolidated Loan is applied to the current loan balance of $77,270, the monthly interest accrual is $434.64. Debtor is merely "paying" *on* the student loan debt, he is not repaying principal or interest, nor will he by the end of the 20-year term.[53] Instead he will have to rely on forgiveness of the outstanding balance at the end of twenty years, when Goodvin's student loan debt will likely have ballooned to an amount far more than it is today so long as the accrual of interest outpaces the REPAYE plan payment.

---

[52] Ex. 12, p. 454.

[53] *See Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale),* 529 B.R. 641, 649-50 (Bankr. M.D.N.C. 2015) (refusing "to jump the logical chasm necessary" to conclude that an IDR plan that requires zero payment constitutes "repayment" and finding the first prong of *Brunner* satisfied); *Reagan v. Educ. Credit Mgmt. Corp. (In re Reagan),* 587 B.R. 296, 303 (Bankr. W.D. Pa. 2018) (rejecting argument that *Brunner's* first prong can't be met where debtor has a $0-dollar payment); *Pierson v. Navient, et al (In re Pierson),* Adv. No. 17-3096, 2018 WL 4849658, at *7 (Bankr. N.D. Ohio Oct. 4, 2018) (satisfying first prong of *Brunner* notwithstanding debtor's participation in IBR plan with a zero payment).

21

In its purest sense, Goodvin is unable to *repay* the student loan debt while maintaining a minimal standard of living.[54] Goodvin satisfies the first prong of *Brunner*.

### 2. Additional Circumstances that Goodvin's Situation is Likely to Persist

Defendants contend that even if Goodvin satisfies *Brunner's* first prong, his financial situation is likely to improve during the 20-year repayment period of a REPAYE plan, enabling him to make a larger monthly payment as his AGI increases. They do not contend, however, that Goodvin will be able to *repay* the debt during the 20-year repayment period. Based on the current union pay scale, as Goodvin advances through the apprenticeship program he will receive an annual hourly rate increase of $3.47 for each succeeding year of the program. His forty-five-week regular net income will therefore increase each year of his apprenticeship provided he remains employed. If and when he attains journeyman certification at age sixty, his hourly rate will bump up another $3.48 to $34.76.[55] But this anticipated increase in income and presumed increase in AGI would not yield a monthly payment under

---

[54] *See Educ. Credit Mgmt. Corp. v. Metz (In re Metz),* No. 18-1281-JWB, 2019 WL 1953119, at *5 (D. Kan. May 2, 2019) (noting the *Polleys* court's use of the term "repaying" the debt suggests that courts should determine whether sufficient payments can be made to pay down the principal).

[55] *See* Ex. 7, pp. 268-69.

REPAYE that would repay the interest and pay down principal on the consolidation loan.

It also ignores the entire twenty-year repayment term (2020–2040) and Goodvin's plan to retire at his full retirement age of sixty-seven, ten years into the REPAYE plan.[56] Goodvin's highest earning capacity as a journeyman will only last seven years, from 2024 through 2030. At that point, his only income will be meager retirement funds and social security. He has already liquidated most of his modest prepetition retirement accounts, save for a $12,000 IRA from his time working for the City of Santa Barbara.[57] He has been unable to save further for retirement in his monthly budget. Goodvin may be eligible to receive a pension through the local union, but he was unsure how many years he had to work for that benefit to vest or the amount of the pension.[58]

Upon retiring, Goodvin's social security benefit is likely to be the predominant source of his income. It will be substantially less than his

---

[56] The second prong of *Brunner* considers whether there are other circumstances making it likely that debtor will not be able to pay his loans for a significant portion of the repayment period. *See Alderete v. Educ. Credit Mgmt. Corp (In re Alderete)*, 412 F.3d 1200, 1205 (10th Cir. 2005).

[57] Goodvin liquidated a $12,000 retirement account to make a down payment on his home and took another IRA distribution of some $2,300 to pay his attorney for the bankruptcy filing.

[58] Goodvin testified in his deposition that he thought it took twenty years to become fully vested in the local pension but the local union made no contributions on his behalf. Ex. 11, p. 000303 (Deposition pp. 50-51).

23

journeyman income. The monthly social security retirement benefit is based on the highest thirty-five years of earnings.[59] Goodvin's highest earnings as a journeyman over a 7-year period will be diluted by his twenty-eight years of lower earnings. And social security doesn't pay one hundred percent of one's pre-retirement income; retirees receive on average forty percent of their pre-retirement income.[60] In retirement then, Goodvin's lower income is likely to result in a lower or zero payment under the REPAYE plan for the last ten years of the plan, while the balance of his student loan debt will continue to accrue interest and grow exponentially. He will likely have difficulty maintaining his current budget. This is the same situation Goodvin finds himself presently. The Court finds that Goodvin's circumstances are likely to persist for a significant portion of the repayment period. Goodvin satisfies the second *Brunner* prong.

### 3. Good Faith Efforts to Repay

This prong requires the Court to "focus on questions surrounding the legitimacy of the basis for seeking a discharge" and whether debtor "willfully contrive[d] a hardship."[61] Courts should look at "'efforts to obtain

---

[59] *See* https://www.ssa.gov/benefits/retirement/learn.html#h1 viewed on Aug. 5, 2020.
[60] *Id.*
[61] *Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302. 1310 (10th Cir. 2004).

24

employment, maximize income and minimize expenses."[62] The Court is particularly struck by Goodvin's efforts to repay his student loans, better his employment opportunities, and improve his income earning capability at this stage of his life. During his first career in photography and filmmaking, he moved from California to the Midwest to find jobs where the cost-of-living was cheaper.[63] He freelanced when he could not find regular employment. Through no apparent fault of his own, Goodvin's working years have been marked by repeated job loss and intermittent unemployment. Goodvin's trial testimony was sincere and showed his frustration with an inability to get ahead, save money, and plan for his retirement years. He has an income problem that he has tried mightily to rectify over the years, most recently by changing his career path mid-life to a HVAC service technician to find better paying and more stable employment opportunities. Through it all he has enrolled in the Standard, Graduated, and IBR repayment plans and managed to pay $21,817 on the ECMC loans having a principal amount of $15,577 and $6,256 on the DOE loans in the principal amount of $23,500. There may be

---

[62] *Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland),* 424 B.R. 883, 890 (Bankr. D. Kan. 2010) (quoting *In re Innes,* 284 B.R. 496, 510 (D. Kan. 2002)).
[63] *See Azwar v. Texas Guaranteed Student Loan Corp. (In re Azwar),* 326 B.R. 165, 174 (10th Cir. BAP 2005) (unwillingness to re-locate to pursue other employment); *Wolph v. U.S. Dept. of Educ. (In re Wolph),* 479 B.R. 725, 732 (Bankr. N.D. Ohio 2012) (debtor unwilling to seek employment in a large metropolitan area where greater prospects of higher paying jobs existed).

student loan debtors who have willfully contrived a hardship, but Goodvin is not one of them.

As noted previously, the availability of an IDR repayment plan like the REPAYE plan is a factor in the good faith analysis.[64] Goodvin availed himself of an IDR plan with respect to the five DOE loans. He enrolled in an IBR plan in late 2016, making monthly payments of $46.83 during 2017-2019, until he filed bankruptcy. His participation in the IBR plan yielded a negative amortization of the DOE $4,000 loan.[65] That loan's current balance of $7,493 is nearly double the original principal amount due to the $42 monthly interest accrual. Goodvin clearly recognizes that his participation in another IDR plan like REPAYE *for all his loans* is an exercise in futility.[66] As noted previously, Goodvin will retire ten years into the repayment period and have little, if any, discretionary income from which to make payments for the final ten years of the period.[67] After twenty years he will not have repaid his

---

[64] Though enrollment in an IDR plan is not required to satisfy the good-faith prong, Goodvin has in fact already participated in an IBR plan. *See Alderete,* 412 F.3d at 1206.

[65] *Help or Hardship?,* 160 GEO. L. J. 1278, 1339 (describing negative amortization as the situation when the IDR payments are insufficient to cover the interest on the debt, resulting in a rising debt balance while the debtor is in an IDR plan).

[66] Because the student loan debtor pays even less discretionary income (10%) under the REPAYE plan over the twenty-year period, the outcome at the end will be even worse than the IBR plan paying 15% of discretionary income. *See Murray,* 563 B.R. at 59-60 (discharging portion of student loan debt where monthly payments, though affordable under repayment plan, would be insufficient to pay the interest).

[67] *See Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon),* 435 B.R. 791, 803-04 (1st Cir. BAP 2010) (when the projected IDR payment is zero, the availability of

26

student loan debt. Rather, Goodvin's student loan debt will have ballooned even more. Goodvin's reluctance to participate in the REPAYE plan for another twenty years is not a lack of good faith; it's called hopelessness. The REPAYE plan effectively eliminates Goodvin's fresh start, or at best, delays it until he is seventy-six years of age.[68]

Goodvin has made a good faith effort to repay his student loans and satisfies the third *Brunner* prong.

## B. Partial Discharge of Goodvin's Student Loan Debt

In *Alderete,* the Tenth Circuit Court of Appeals recognized the bankruptcy court's ability to partially discharge student loans, provided it makes the requisite findings that repaying part of the student loan debt imposes an undue hardship on debtor.[69] The courts in this District have granted partial discharge of student loan debt in circumstances similar to those here.

---

IDR should not bar discharge); *Roth v. Educ. Credit Mgmt. Corp. (In re Roth),* 490 B.R. 908, 919-20 (9th Cir. BAP 2013) (finding it "futile" to make the debtor enroll in IDR to make "payments" of zero).

[68] As District Court Judge Broomes remarked in *Metz* "what a pleasant system." *Educ. Credit Mgmt. Corp. v. Metz,* No. 18-1281-JWB, 2019 WL 1953119, at *5 n.7 (D. Kan. May 2, 2019) (regarding debtor's prospect of staying in an IDR plan until she is 80 years old when the debt is forgiven and keeping her impoverished or insolvent during the repayment period). *See Help or Hardship?,* 160 Geo. L. J. 1287, 1328-1350 (evaluating certain factual situations when failure to participate in an IDR plan should not weigh against good faith). *See also Nightingale,* 529 B.R. 641, 650 (noting the injustice of denying discharge when the debtor has a zero-payment IDR option and denying a fresh start to the debtor most in need of one).

[69] *Alderete,* 412 F.3d at 1207.

In *Metz,*[70] the debtor borrowed $16,613 to fund her studies at a community college from 1989 to1991; she earned no degree. In 1994, she combined her loans into a 9% interest-bearing consolidation loan. She paid a total of $14,789 on the student loan debt, most of it through three successive chapter 13 plans. At the time of trial, the debtor was fifty-nine years of age and her outstanding loan balance was $67,278. She declined to participate in an IDR repayment plan contending that she could not maintain a minimal standard of living while repaying the loan. The debtor was steadily employed and her income had gradually increased due to modest pay raises. Like the current case, the debtor's consolidation loan was in a negative amortization. The bankruptcy court granted the debtor a partial discharge, concluding that paying the accrued interest on her consolidation loan imposed an undue hardship and thwarted her fresh start.[71] On appeal, the district court affirmed the bankruptcy court's discharge of all but the original principal balance of the consolidated loan.[72]

---

[70] *Metz v. Educ. Credit Mgmt. Corp. (In re Metz),* 589 B.R. 750 (Bankr. D. Kan. 2018), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Metz,* No. 18-1281-JWB, 2019 WL 1953119 (D. Kan. May 2, 2019).
[71] 589 B.R. at 759 (concluding that loan in a negative amortization was not a fresh start).
[72] *Metz,* 2019 WL 1953119 (D. Kan. May 2, 2019).

28

In *Murray,*[73] the debtor-wife borrowed $41,883 through a series of

twelve loans to obtain undergraduate and master's degrees in music and

debtor-husband borrowed $35,641 through nineteen loans to obtain his

undergraduate and master's degrees in vocal music. The debt was incurred in

the late 1980's to the mid-1990's. At the time of trial, the debtors were in

their late forties. As of September 2016, the wife owed $168,178 on a

principal balance of $144,344 on her consolidated loans and the husband

owed $143,390 on a principal balance of $123,043 on his. They made

payments of $54,000 over four years under an IBR plan until they filed

bankruptcy, but that was insufficient to pay the interest accruing at 9% on

the consolidated loans. They were both employed and had monthly disposable

income of $1,658 that was sufficient to make monthly payments under the

IBR plan or the REPAYE plan. The bankruptcy court concluded that the

debtors could not maintain a minimal standard of living if forced to repay the

full $311,569 owed on their student loans. Though the IBR and REPAYE

monthly payments were affordable, they were insufficient to pay the interest

accruing on the loans and the debt would increase under these payment

options. The *Murray* court rejected "the availability of repayment plans as a

---

[73] *Murray v. Educ. Credit Mgmt. Corp. (In re Murray)*, 563 B.R. 52 (Bankr. D. Kan. 2016), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Murray,* No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).

basis for finding Debtors' net income to be sufficient to repay the loans while maintaining a minimal standard of living."[74] It concluded that applying the *Brunner* factors in such a fashion fails to further the fresh start policy of the Bankruptcy Code. The bankruptcy court granted a partial discharge of the Murrays' student loan debt, discharging the accrued interest on the loans, which comprised 75% of the student loan debt, and excepting from discharge the original principal of $77,524. The district court affirmed the bankruptcy court's decision.[75]

That brings us to the current case and the elephant in the room—ECMC's consolidation loan bearing interest at the rate of 9%. It comprises the oldest and largest portion of Goodwin's student loan debt, some 64%, and bears the highest interest rate. The original loan amount of $12,078 was disbursed in 1992 and is the largest of the seven educational loans he incurred. Goodwin has made payments totaling $19,527 on this consolidation loan. Yet he still owes $49,581. It is the only one of Goodwin's outstanding loans on which he has already paid more than original amount of the loan. It is in negative amortization and that will continue for the duration of a REPAYE plan, ten years of which Goodwin will be retired and likely to pay a zero amount. The interest rate and unpaid principal amount of the loan will

---

[74] 563 B.R. at 60.
[75] *Murray,* 2017 WL 4222980.

weigh more heavily in the determination of the weighted average interest rate if his loans are consolidated under a Direct Consolidation Loan as defendants urge. It is this loan that imposes an undue hardship; it prevents Goodvin from being able to *repay* his student loan debt and attain a fresh start.

The debtor's benefit from bankruptcy's fresh start policy is having "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."[76] The purpose of § 523(a)(8), on the other hand, is "to prevent indebted college . . . students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."[77] Balancing these competing policies under the facts of this case and heeding *Polleys'* admonition that bankruptcy courts should apply the test of undue hardship such that debtors who truly cannot afford to *repay* their loans may have them discharged,[78] I conclude that requiring Goodvin to repay the ECMC consolidation loan imposes an undue hardship on him. It is discharged.

## III.   Conclusion

---

[76] *Local Loan v. Hunt,* 292 U.S. 234, 244 (1934).
[77] *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby),* 144 F.3d 433, 436-37 (6th Cir. 1998).
[78] *Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302, 1309 (10th Cir. 2004) (applying the undue hardship test "to better advance the Bankruptcy Code's 'fresh start' policy" and to give judges discretion to weigh all the relevant considerations).

The Court grants in part, and denies in part, Goodvin's complaint to discharge his student loan debt under 11 U.S.C. § 523(a)(8). Finding that repayment of the ECMC consolidation loan imposes an undue hardship on Goodvin, it is discharged in toto. The remaining six student loans with a combined balance of approximately $27,689 are excepted from Goodvin's discharge.[79] Judgment will be entered this day.

# # #

---

[79] $77,270.06 of total student loan debt minus the $49,581.09 ECMC consolidation loan = $27,688.97. *See* Ex. 12, p. 453 and ECMC Ex. A.